Filed 4/21/14  P. v. Pardue CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C064864 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F01893) |
| v. | |
| SHONN LYNN PARDUE, | |
| Defendant and Appellant. | |

Defendant Shonn Lynn Pardue became upset over the breakup of a romantic relationship and violently lashed out at his former girlfriend, Dominique Griffin, her family, and a friend.  A jury found defendant guilty of two counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2)),[1] three counts of kidnapping (§ 207, subd. (a)), three counts of making criminal threats (§ 422), two counts of attempted criminal threats

---

[1]  Undesignated statutory references are to the Penal Code.

1

(§§ 664, 422), and unlawful possession of ammunition (former § 12316, subd. (b)(1)). The jury also found true three allegations of personal use of a firearm (§ 12022.5, subd. (a)[(1)]) and one allegation of personal infliction of great bodily injury (§ 12022.7, subd. (a)). Defendant was sentenced to 175 years to life plus a determinate term of 11 years four months.

Defendant appeals, contending (1) the prosecutor discriminated against African-Americans during jury selection (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*)), (2) the trial court improperly excluded third party culpability evidence, (3) defense counsel was ineffective for failing to object to sanitizing the victims' prior convictions for impeachment, (4) the prosecutor committed misconduct in closing argument, and (5) the trial court made various sentencing errors.

We conclude there were sentencing errors and remand for resentencing, but otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A third amended information filed on March 3, 2010 charged defendant with the following offenses involving five victims committed on or about[2] March 2, 2008:

**Count One** - Assault with a firearm on Mikio Morris, with personal use of a firearm. (§§ 245, subd. (a)(2), 1203.06, subd. (a)(1), 12022.5, subd. (a)[3].)

**Count Two** - Kidnapping of Mikio Morris, with personal use of a firearm. (§§ 207, subd. (a), 1203.06, subd. (a)(1), 12022.5, subd. (a).)

**Count Three** - Criminal threats against Mikio Morris, with personal use of a firearm. (§§ 422, 1203.06, subd. (a)(1), 12022.5, subd. (a).)

---

[2] The events began on March 2d and continued until 1:20 a.m. on March 3d.

[3] We note that at the time of this offense, there was no subdivision (a)(1) of section 12022.5. There was only a subdivision (a).

2

**Count Four** - Attempted criminal threats against Vivian Richardson. (§§ 422, 664.)

**Count Five** - Assault with a firearm on Mark McFadzean, with personal use of a firearm and personal infliction of great bodily injury. (§§ 245, subd. (a)(2), 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.7, subd. (a).)

**Count Six** - Kidnapping of Mark McFadzean, with personal discharge of a firearm and personal infliction of great bodily injury. (§§ 207, subd. (a), 12022.53, subds. (c)-(d), 12022.7, subd. (a).)

**Count Seven** - Kidnapping of Dominique Griffin. (§ 207, subd. (a).)

**Count Eight** - Criminal threats against Mark McFadzean, with personal use of a firearm. (§§ 422, 1203.06, subd. (a)(1), 12022.5, subd. (a).)

**Count Nine** - Criminal threats against Dominique Griffin, with personal use of a firearm. (§§ 422, 1203.06, subd. (a)(1), 12022.5, subd. (a).)

**Count Ten** - Criminal threats against D.W., with personal use of a firearm. (§§ 422, 1203.06, subd. (a)(1), 12022.5, subd. (a).)

**Count Eleven** - Unlawful possession of ammunition by a felon. (former § 12316, subd. (b)(1).)

The pleading also alleged two prior serious felony convictions from October 1997, assault with a firearm and first degree burglary. (§ 667, subds. (b)-(i), 1170.12.)

### The Prosecution's Case

Defendant and victim Dominique Griffin had a romantic relationship that ended in February 2008 when defendant moved out of the home they had shared with their three-year-old daughter and Griffin's eight-year-old son and 15-year-old daughter, D.W.

In the early afternoon of March 2, 2008, defendant became upset when he could not find Griffin at her home and saw in her driveway the car of a man, Mark McFadzean,

3

whom defendant believed was Griffin's new boyfriend.[4] D.W. telephoned Griffin's mother, Vivian Richardson, and said defendant was at the house acting crazy. Richardson has known defendant since he was a child and knows him to be prone to "excited episodes." Defendant then phoned Richardson, said he was upset about the end of his relationship with Griffin and planned to vandalize the new boyfriend's car or have it impounded. Richardson asked her godson, Mikio Morris, to protect McFadzean's car by blocking it with her truck. Morris did so. Morris then walked down the street to get an ice cream. As he walked back toward the house, defendant met Morris in the driveway. He put his arm around Morris, pressed a gun in Morris's rib, and ordered him into Griffin's house, saying he did not want to shoot Morris outside. Inside, Morris saw defendant's two nephews, looking mad. At gunpoint, defendant questioned Morris about Griffin's whereabouts. Morris said he had had an argument with Griffin and had not spoken to her for about a month. Defendant demanded to check Morris's cell phone call history and threatened to shoot Morris if Griffin's number appeared. When Griffin's number did not appear in the cell phone, defendant wept and said he did not know where Griffin or their daughter was. Morris received a phone call from Richardson and told her that defendant was at the house with a gun. Defendant moved out of Morris's view, and Morris heard clinking sounds like the unloading of a gun. Defendant returned and showed Morris that the gun was unloaded.

Richardson, without calling the police, drove to Griffin's house. Defendant, crying and angry, said he was going to take his daughter, kill himself and everyone else. Richardson did not take the threats seriously and told defendant to stop talking crazy. She never saw defendant holding a gun at the house that day but she did see a revolver on a table.

---

[4] Griffin and McFadzean testified they were just friends at the time of the offenses (March 2008). But by the time of trial in March 2010, they were married.

4

Richardson said she would give defendant his daughter in exchange for defendant releasing Morris. Richardson testified she feared defendant might hurt Morris but believed defendant would not hurt his own daughter. Everyone drove in Richardson's van to her home, a short distance away. Morris went inside, got defendant's daughter and gave her to defendant. Defendant physically blocked Morris from getting back into the van, and Richardson told Morris to stay. Richardson drove defendant, his daughter, and his nephews to a grocery store and thereafter dropped them all off with defendant's sister, Nedra King. No one called the police at that time.

Richardson later received a phone call from Griffin, who was in Los Angeles. Richardson related what had happened. Griffin said to call the police. Richardson was reluctant because she did not want to get defendant in trouble, and having watched prior similar episodes of defendant, she did not believe his conduct was completely out of the ordinary. When Richardson eventually spoke with police, she said she had not called them because defendant threatened to kill everyone if she did. Her main motivation was to get defendant away from her family.

Griffin and McFadzean returned that night around 10:30 or 11:00 p.m. (according to Griffin) or between 9:00 and 11:00 p.m. (according to McFadzean). The security gate on Griffin's front door was locked. D.W. let them in. Griffin saw that her bedroom had been ransacked. As she walked through the house, defendant jumped out from behind a speaker, where he had been hiding. He had a gun in his hand and said, "I'm gonna fucking kill you." She picked up a phone. He pointed the gun at her, said, "Put the fucking phone down," and "I'm gonna kill you." She feared for her life and threw the phone down.

Defendant grabbed McFadzean around the neck from behind, hit him with the gun, pulled him into the living room and had him sit or kneel. McFadzean said he was Griffin's friend. Defendant said, "That's my fuckin' wife." Defendant got upset, yelling and screaming. D.W. came out of her room. Griffin testified that everyone was yelling

5

and screaming, pleading with defendant to calm down. McFadzean, who is smaller than defendant, testified he was afraid for his life and kept quiet. Defendant kept pointing the gun back and forth, saying, "You guys, I'll fucking kill you." Griffin pleaded with defendant just to take her and leave everyone else alone. Defendant replied, "No, this mother fucker is my ticket to Oak Park."

Defendant grabbed McFadzean in a headlock with a gun to his head. Griffin, followed by defendant, who was holding McFadzean, went outside. Defendant told Griffin to drive. Defendant made McFadzean lie face down in the backseat of Griffin's car and held the gun to the back of McFadzean's head. D.W., who had insisted on accompanying them, tried to talk defendant down.[5] Defendant directed Griffin to drive to his sister Nedra's home and honk the horn. No one came out. Defendant told Griffin, "Your daughter's in that house. Go get [her], go." Griffin knocked on the door but no one answered. Defendant started screaming for his sister to come outside, with no response. Defendant started shaking, rocking the car, and saying "This is what you want. This is what you want," and fired the gun, shooting McFadzean in the leg. Defendant jumped out of the car. Griffin ran to the back of the car and saw McFadzean's head hanging down outside of the car, with his legs still inside the car. Defendant, with the gun in his hand, said, "I'm gonna kill this mother fucker. I'm going to kill this mother fucker." Defendant's sister and niece came outside, distracting defendant. Griffin and D.W. got back in the car and drove off with McFadzean toward a hospital. Griffin called 911 as they drove. They stopped when they saw a police officer, and the officer summoned an ambulance.

The jury saw a video captured by a camera mounted on the patrol car, showing Griffin and D.W. upset outside the car while the police assisted McFadzean. The video

_____

[5] D.W. did not testify.

also showed Vivian Richardson arriving about 45 minutes later, and a crime scene investigation officer opening the trunk of the car, allowing Griffin to remove belongings before the car was impounded.

While Griffin was in the police station, she received a phone call from defendant. He demanded, "Why did you tell the police I kidnapped my daughter?" By that time, the incident had been reported on the news.

Later, after Griffin arrived at her home, she asked the police to check the premises because she was in fear defendant might be lying in wait for her. The police found a duffel bag in Griffin's yard. The yard was wet from a recent rain, but the duffel bag was dry. The bag contained .357 revolver ammunition, defendant's parole card, and personal photos of defendant and Griffin, including some of a sexual nature.[6]

Defendant called Griffin later on March 3, claiming he was leaving town with their daughter and would get a new mother for her. However, Griffin was able to retrieve the child from defendant's relatives.

Police arrested defendant in Las Vegas a year later, in March 2009. When arrested, defendant used the name of his brother, Richard Pardue.

A treating trauma surgeon testified McFadzean lost a substantial amount of blood before arriving in the emergency room and would have died within a couple of hours without medical treatment. A projectile penetrated the right thigh and lodged in the left thigh. The femoral artery in McFadzean's right leg was cut in half, and the femur bone in his left thigh was shattered. McFadzean was in surgery for several hours. Doctors removed a vein from his left leg to repair his artery and placed a rod in his left leg to replace the shattered bone. The surgeon removed bullet fragments from his leg and

---

[6] The parties stipulated defendant was a felon at the time he was alleged to be a felon in possession of ammunition.

7

opined that the wounds were consistent with gunshot wounds. McFadzean remains in pain and will have to take medication for the rest of his life to avoid a fatal blood clot.

McFadzean testified that he lost consciousness shortly after being shot. The next thing he remembered was waking up in the hospital connected to breathing tubes.

At trial, as at the preliminary hearing, McFadzean identified defendant as the perpetrator. McFadzean did not identify defendant when police presented him with a photo lineup in the hospital; but at that time he was in pain, on pain medication, and attached to breathing tubes.

On the witness stand, Griffin admitted she was convicted of "two felonies involving moral turpitude" in 2005. McFadzean admitted he was convicted of "three crimes of moral turpitude" in 1992, "a crime of moral turpitude" in 1993, "two crimes of moral turpitude" in 1996, and two or three other "crime[s] of moral turpitude" between 1997 and 1999. By 2008, he had turned his life around and had become an auto mechanic and business owner.

### The Defense Case

The defense called defendant's sister Nedra King as a witness, but she invoked the privilege against self-incrimination.

Defendant's niece, A.B., testified. She claimed she did not hear a gunshot and came out of her house because someone knocked on the door. She saw defendant and Griffin arguing not far from a burgundy car, and saw D.W. crying and screaming. A.B. said she did not know what was happening and ran around the corner to get a cousin. When she returned, the group was gone. The niece initially denied seeing a man in the car but admitted it after the prosecutor confronted her with her statement to police. She admitted she was "adjudicated for a crime involving moral turpitude" in 2006.

Defendant's older brother, Richard Pardue, testified to his opinion that Griffin is untrustworthy, based on her having falsely told defendant that she and Richard had had

8

sex. Richard believes he and defendant are honest persons. Richard admitted he was convicted of "a misdemeanor crime of moral turpitude" in 2001.

<strong>Verdicts and Sentencing</strong>

On March 22, 2010, the jury found defendant guilty on all counts except count ten, as to which the jury found defendant not guilty of criminal threats against D.W., but guilty of the lesser included offense of attempted criminal threats. The jury found true three allegations of personal use of a firearm and two allegations of personal infliction of great bodily injury. Subsequently, the trial court found true the two prior serious felony conviction allegations and declined to strike these allegations.

On April 19, 2010, the trial court sentenced defendant as follows:

**Count One** - Assault with a firearm on Morris, 25 years to life, plus 10 years for a firearm enhancement (§ 12022.5, subd. (a));

**Count Two** - Kidnapping of Morris, concurrent 25 years to life;

**Count Three** - Criminal threats against Morris, 25 years to life, stayed pursuant to section 654;[7]

**Count Four** - Attempted criminal threats against Richardson, concurrent 25 years to life;

**Count Five** - Assault with a firearm on McFadzean, consecutive 25 years to life, plus a consecutive term of 25 years to life for a firearm enhancement § 12022.53, subd. (c)),[8] with an additional 10 years for another firearm enhancement pursuant to section 12022.5, subdivision (d), stayed pursuant to section 654;

---

[7] We discuss *post* the court's sentencing in which it stayed the sentences on the criminal threats counts related to Morris, McFadzean and Griffin pursuant to section 654, but also ordered that the same sentences run concurrently or consecutively.

[8] We discuss *post* the fact that this enhancement was not charged as to count five, and the court did not sentence defendant on the great bodily injury allegation the jury found true.

9

**Count Six** - Kidnapping of McFadzean, consecutive 25 years to life;

**Count Seven** - Kidnapping of Griffin, consecutive 25 years to life;

**Count Eight** - Criminal threats against McFadzean, 25 years to life, stayed pursuant to section 654;

**Count Nine** - Criminal threats against Griffin, 25 years to life, stayed pursuant to section 654;

**Count Ten** - Attempted criminal threats against D.W., consecutive 25 years to life plus a 16-month term for personal use of a firearm (§ 12022.5, subd. (a)); and

**Count Eleven** - Unlawful possession of ammunition, consecutive 25 years to life.

The total aggregate term imposed was 175 years to life plus a determinate term of 11 years four months.

## DISCUSSION

### I. *Wheeler/Batson* Claim

Defendant contends the judgment must be reversed due *Wheeler*/*Batson* error. We disagree.

### A. Background

Defendant is African-American. The record indicates the venire included four prospective jurors who are African-American. Based on the number of jury questionnaires in the record, there were a total of 64 prospective jurors in the venire. During voir dire, the prosecutor used a peremptory challenge to excuse an African-American woman, Ms. A. The jury, as ultimately sworn, contained one African-American juror.

On March 9, 2010, before the jury was sworn, defense counsel stated on the record that he had not immediately objected to the peremptory challenge of Ms. A. but, before the next peremptory challenge, he had asked to approach, at which time, the court and counsel had gone into chambers. At that time, defense counsel had asked to set forth a prima facie case for a *Wheeler*/*Batson* motion, but the trial court had stated it was too late

10

because the prospective juror was probably already gone and was no longer available, and defense counsel could make his record later.[9]

After the jury was sworn, defense counsel stated on the record that he was now moving for a mistrial, "because there is nothing we can do about it now, because the jury has been sworn." Defense counsel said that when Ms. A. was dismissed, there was only one other African-American in the box (who became a sworn juror) and no African-Americans in the audience. He had excused for cause one prospective African-American juror. The prosecutor had used a peremptory challenge on one other prospective African-American juror, Mr. C.[10] In defense counsel's opinion, the prosecution should have wanted Ms. A. as a juror, because she was a victim of domestic violence in the 1980's, and in defense counsel's opinion ("it was my own perception"), Ms. A.'s body language suggested displeasure when she described her daughter's decision not to pursue prosecution when the daughter was sexually assaulted.

---

[9] On appeal, the People agree with defendant that it was *not* too late for a *Wheeler/Batson* motion, because the jury had not yet been impaneled at that point. (*People v. Roldan* (2005) 35 Cal.4th 646, 700-702, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*); *People v. McDermott* (2002) 28 Cal.4th 946, 969-970.) Also, we note that the "usual remedy" for a *Wheeler/Batson* violation is not seating the improperly challenged juror, but rather declaring a mistrial, dismissing the remaining panel and starting jury selection anew. Alternative remedies, such as seating the improperly excused juror or additional challenges for the moving party, may be provided upon the moving party's consent or waiver of the "usual remedy." (*People v. Mata* (2013) 57 Cal.4th 178, 181; *People v. Willis* (2002) 27 Cal.4th 811, 821, 823-824.) Consequently, the fact that an improperly excused juror is no longer available does not preclude a *Wheeler/Batson* violation finding.

[10] Defendant repeatedly emphasizes that the prosecutor peremptorily challenged two of the four available African-American jurors. However, defense counsel did not complain about the prosecutor's peremptory challenge of Mr. C. "The failure to articulate clearly a *Wheeler/Batson* objection forfeits the issue for appeal." (*People v. Lewis* (2008) 43 Cal.4th 415, 481 (*Lewis*).) Consequently, we reject defendant's attempt to use the excusal of Mr. C. to bolster his showing on appeal.

The trial court stated the defense had not made a prima facie case. The court nevertheless invited the prosecutor to respond.

The prosecutor noted he himself is African-American[11] and offered his reasons for excusing Ms. A.: "[S]he explained that she had a domestic violence [previously]. I don't think that's something that a prosecutor necessarily wants to have on a domestic violence case, especially in light [of] the fact that she did not notify law enforcement. [¶] I asked her if she continued a relationship with that individual afterwards. She was unclear about it. Additionally, it didn't appear that law enforcement was called when her daughter was raped or sexually assaulted. [¶] I had an issue with that because it appeared that she didn't call law enforcement when these terrible things happened to her. I didn't know if that meant she had an issue with law enforcement or if she didn't think that what happened was important enough. [¶] Furthermore, your Honor, she stated that her son had a recent assault where he was prosecuted, and that occurred fairly recently. [¶] So I think in light of the numerous issues with her family and herself, we were more than justified to excuse her."

The trial court denied the mistrial motion, stating regarding the prosecutor's characterization of Ms. A.'s voir dire, "that's what I recall, which made sense to me as to

_____

[11] We note that this circumstance is not relevant to the determination of whether the prosecutor excused Ms. A based on group bias. What would have been relevant is the race of the victims and witnesses in the case. When the victims and/or prosecution witnesses are members of the cognizable group, this circumstance cuts against a finding of group bias because there is less motive for the prosecutor to discriminate against prospective jurors who are members of the same group. (*Hernandez v. New York* (1991) 500 U.S. 352, 369-370 [114 L.Ed.2d 395]; *People v. Cleveland* (2004) 32 Cal.4th 704, 734; *People v. Reynoso* (2003) 31 Cal.4th 903, 926, fn. 7; *People v. Perez* (1996) 48 Cal.App.4th 1310, 1315; *People v. Ortega* (1984) 156 Cal.App.3d 63, 70-71.) However, the record here does not reflect that the prosecutor informed the court of the race of the victims during the *Wheeler/Batson* motion and we are unable to determine their race otherwise.

why she was excluded.  [¶]  There's no basis upon which I can grant the motion.  [¶]  It's denied."

## B.  Analysis

Under *Wheeler* and *Batson*, the use of peremptory challenges to remove prospective jurors because of race is prohibited.  "[T]hree steps . . . guide trial courts' constitutional review of peremptory strikes. . . .  First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'  [Citations.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'  [Citation.]"  (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129], fn. omitted (*Johnson*), citing *Batson*, *supra*, 476 U.S. at pp. 93-94.)  The defendant ultimately carries the burden of persuasion to prove the existence of purposeful discrimination.  (*Johnson*, *supra*, 545 U.S. at pp. 170-171.)

*Johnson* disapproved California's standard of requiring a defendant at step one to show that it is " 'more likely than not' " that the peremptory challenges, if unexplained, were based on impermissible group bias.  (*Johnson*, *supra*, 545 U.S. at pp. 168, 170, 173.)  *Johnson* held instead that a defendant satisfies the first step "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  (*Id*. at p. 170.)  If "it is unclear whether the trial court used the disapproved 'strong likelihood' standard, . . . 'we review the record independently to determine whether the record supports an inference that the prosecutor excused a juror on a prohibited discriminatory basis.' "  (*People v. Davis* (2009) 46 Cal.4th 539, 583; see *id.* at p. 582.)  However, where, as here, the trial court states the defendant failed to make a prima facie case, but the court nevertheless considers reasons offered by the prosecutor

13

and concludes there was no discrimination, the issue of whether the defendant has established a prima facie case becomes moot. (*People v. Mills* (2010) 48 Cal.4th 158, 174-175.) Where there is ambiguity as to whether the trial court denied the motion based on the absence of a prima facie case or a finding that the prosecutor's reasons were credible and reasonable, we will assume for the sake of argument that the trial court implicitly found a prima facie case but accepted the prosecutor's reasons as race neutral. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 505 (*Adanandus*).)

On appeal, we review the trial court's acceptance of the prosecutor's race-neutral reasons under the substantial evidence standard of review, "giving deference to the trial court's sincere and reasoned efforts to evaluate the prosecutor's reasons." (*People v. Riccardi* (2012) 54 Cal.4th 758, 787 [" ' "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province' " ' "]; *People v. Semien* (2008) 162 Cal.App.4th 701, 708.) Here, although there were discrepancies between the prosecutor's recollection of what Ms. A. had said on voir dire and what she actually said, the record as a whole supports the prosecutor's race-neutral explanation for excusing her.

In her juror questionnaire, Ms. A. answered "Yes Rape" to the question whether she, a close friend or relative had ever been a victim of a crime, and she answered "Yes Assault" to the question whether she, a close friend or relative had ever been arrested for a crime. During voir dire, Ms. A. said she had had no negative experiences with law enforcement. When asked if she believed law enforcement should be involved in domestic violence or stay out of it, she said, "No, I don't think it should just be a family issue. [¶] . . . [¶] . . . I was a victim of domestic violence. I didn't pursue any legal action. I was blessed and fortunate that my family got me out of that situation. But I definitely -- looking back, you know, in hindsight, I definitely would have taken legal -- gone the legal route, because it was like so fearful. I was so fearful at that point." When asked if she regretted that she did not contact law enforcement, she said, "Yeah, I am

[*sic*]." The domestic violence involving Ms. A. occurred in the early 1980's. She did not contact law enforcement because "given the day and the time, it wasn't as if there's the resources that are available today. And I was very fearful. And so, you know, with the resources that I'm aware of today, it would be a different situation." When asked if she stayed in the relationship after the domestic violence, she said, "Well, I was in a relationship for like three years; and I eventually just -- you know, like I said, with the help of my family and friends, just they just took me away."

Ms. A. additionally said her daughter was a victim, apparently of a domestic violence sexual assault, in 1993, and the police were called, but the person was not prosecuted because her daughter did not want to go forward with the case. Around 1990, Ms. A.'s son was prosecuted for a misdemeanor assault when he had had too much to drink after graduation and got into a fight with a friend. It was resolved before trial. She thought her son was treated fairly.

A prosecutor's explanation need not rise to the level of a challenge for cause. (*Batson*, *supra*, 476 U.S. at p. 97; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122 (*Gutierrez*).) A juror may be excused even on a hunch (*Gutierrez*, *supra*, 28 Cal.4th at p. 1122), and even a trivial reason, if genuine and group neutral, will suffice (*People v. Arias* (1996) 13 Cal.4th 92, 136).

Defendant is correct that the prosecutor was wrong when he said Ms. A.'s son's assault prosecution was "recent," because it happened 20 years earlier. Nevertheless, this inaccuracy does not prove the exclusion discriminatory. (*People v. Jones* (2011) 51 Cal.4th 346, 358, 366.) In *Jones*, the prospective juror wrote on the juror questionnaire that his son had been accused of a crime but the prospective juror did not disclose the crime. (*Jones*, *supra*, at pp. 358, 366.) In explaining his peremptory challenge, the prosecutor mistakenly said " 'I think it was attempt[ed] murder or murder.' " (*Id.* at p. 358.) The *Jones* court upheld denial of the defendant's *Wheeler/Batson* motion, noting that there was no reason to assume the prosecutor

15

intentionally misstated the matter, and an honest mistake by a prosecutor does not compel the conclusion that the prosecutor's reason for exclusion was insincere. (*Id.* at p. 366.) Plus, the fact that the prospective juror's son had been accused of a crime would in itself constitute a race-neutral reason for the peremptory challenge. (*Ibid.*)

Here, even if it was not recent, it is well settled that the son's assault prosecution would still have been a valid, group-neutral reason for exercising a peremptory challenge as to Ms. A. (*Wheeler*, *supra*, 22 Cal.3d at p. 277, fn. 18; *Adanandus*, *supra*, 157 Cal.App.4th at pp. 504, 508-509 [son of prospective juror had been convicted of drug offense seven years earlier].)

Moreover, in the instant case, Ms. A.'s son's prosecution was one small point in the prosecutor's list of reasons for the challenge.

The prosecutor's first reason was reluctance to have a domestic violence victim serve as a juror in a domestic violence case, particularly where the victim did not call law enforcement. Despite the discrepancies in the prosecutor's recollection of what Ms. A said on voir dire, this is a group-neutral reason. It is irrelevant that defense counsel claimed he would embrace such a juror were he the prosecutor. The sincerity of the prosecutor's desire to not have jurors with such backgrounds is demonstrated by the fact that the prosecutor also used a peremptory challenge against another prospective juror, Ms. C., who had been a victim of domestic violence in the early 1990's. Ms. C. did not call police because it did not seem necessary. The incident happened as she was moving out of a home after a relationship ended. But now, she does think it appropriate for law enforcement to be involved in domestic violence matters. The record does not disclose her race. Defendant does not contend she was African-American. Thus, the record supports the sincerity of the prosecutor's explanation.

Defendant argues Ms. C. cannot be compared to Ms. A., because Ms. C. never said she regretted her decision not to call the police (it was an isolated incident), whereas Ms. A. was the victim of continuous abuse, expressed regret that she did not call the

16

police, and apparently stayed in the relationship for some time. Defendant cites *People v. Lenix* (2008) 44 Cal.4th 602, 630-631 in arguing that given the differences between the two potential jurors, comparative juror analysis does not refute his claim that the prosecution's challenge of Ms. A. was discriminatory. However, it is defendant's burden to show purposeful discrimination. (*Johnson*, *supra*, 545 U.S. at pp. 170-171; *Lenix*, *supra*, 44 Cal.4th at pp. 612-613.) The differences noted by defendant are not so significant as to require the trial court to doubt the prosecutor's credibility. Both prospective jurors were victims of domestic violence who had not reported their abuser to the police, and the court was justified in accepting the prosecutor's explanation that he did not want people with that background on the jury.

Additionally, the record supports the prosecutor's uncertainty about Ms. A. She was unclear in her response to his question whether she continued the relationship with her abuser. Furthermore, the prosecutor was not required to accept Ms. A.'s expression of a current opinion that government should be involved in such family disputes, which was inconsistent with her past actions. This is not to say that Ms. A. was deceptive. It would be perfectly normal for her attitude to have changed over time in the years since she was a victim. The point is that a prosecutor is not required to gamble on a prospective juror about whom he has reservations. The prosecutor may act on a hunch. (*Gutierrez*, *supra*, 28 Cal.4th at p. 1122.) The record does not support defendant's claim that the prosecutor's reservations were pretexts for race discrimination.

We also observe that an African-American person served on the jury. While the circumstance that a prosecutor accepted a panel containing members of the cognizable group is not conclusive, it is an indication of the prosecutor's good faith in exercising peremptory challenges. (*People v. Snow* (1987) 44 Cal.3d 216, 225.)

Although the trial court did not make an express finding on the prosecutor's credibility, the trial court implicitly so found by stating the prosecutor's characterization

17

of Ms. A.'s voir dire was consistent with the court's observation and "made sense" as reason for exclusion. (*Lewis*, *supra*, 43 Cal.4th at p. 471.)

We conclude there is no reversible *Wheeler*/*Batson* error.

## II. Third Party Culpability Evidence

Defendant argues the trial court erroneously excluded defense evidence of third party culpability. We disagree.

### A. Background

Defense counsel sought to introduce evidence that Griffin previously had been convicted of a federal offense of smuggling drugs into prison and that McFadzean forced her to smuggle narcotics into prison to an inmate named Johnny Jingles. The defense theory was that some unknown person shot McFadzean during a drug transaction gone bad, and McFadzean forced Griffin on the spot to help him frame defendant to eliminate defendant as McFadzean's romantic rival for Griffin's affections. The defense argued the evidence was admissible to prove Griffin's motive falsely to identify defendant as the perpetrator under Evidence Code section 1101.[12]

The trial court ruled that all prior convictions for crimes of moral turpitude would be admissible for impeachment, but said the defense theory of third party culpability was undeveloped. When the issue resurfaced later, the court asked how the proposed evidence would counter the expected testimony of Richardson and Morris. Defense counsel said he had "privileged information," which he would disclose only in camera.

---

[12] Evidence Code section 1101, subdivision (a) makes character evidence generally inadmissible to prove conduct, but subdivision (b) states, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

18

Defense counsel then presented a sealed declaration, stating that defendant had provided counsel with information that Griffin and her family feared McFadzean and were coerced into participating in his drug-trafficking operation. Defendant told counsel that during a conversation he had had with Griffin after the shooting, she told defendant McFadzean had a coat in his car trunk containing thousands of dollars in cash from illegal drug sales, which was the real reason that Richardson wanted to protect McFadzean's car. Griffin removed that same coat from her own car while the police were rendering assistance to the injured McFadzean, and this was depicted on the patrol car video. Griffin and McFadzean were not visiting friends in Los Angeles on the day of the shooting. Instead, they were involved in a drug transaction, during which McFadzean got shot by an unnamed person. Griffin was driving in search of help and encountered defendant on the street. Griffin asked defendant to help. "[Defendant] refused to assist, infuriating all parties in the car, and adding to the bias of the witnesses against him."

Defense counsel indicated he intended to elicit this evidence through cross-examination of the prosecution witnesses. Defendant told counsel he maintained an intimate relationship with Griffin while she engaged in drug trafficking with McFadzean, and *if* defendant testified, he would likely testify to impeach Griffin's denial of drug trafficking and coercion by McFadzean. No explanation was provided in the declaration for the presence of the duffel bag in Griffin's backyard that contained ammunition, defendant's parole card, and photographs of a sexual nature depicting Griffin and defendant.

Defense counsel also stated he intended to call as a witness a prison inmate, Rosalee Barfield, who was in custody on an unrelated case. Counsel for Barfield told defendant's counsel Barfield would not speak with defendant's investigator. However, according to defendant, if Barfield testified, and if she did so truthfully, she would testify that the coat containing thousands of dollars had been in her possession until McFadzean

19

and Griffin took it from her by assaulting her with a handgun earlier on the day Morris was shot.

The trial court issued an order allowing the defense to impeach Griffin with two convictions of a crime of "moral turpitude" stemming from the federal smuggling case but excluding the other proffered evidence on the grounds that defendant failed to make a sufficient showing of relevance and, even assuming relevance, the evidence, including the prosecution's response, would require undue consumption of time on collateral issues under Evidence Code section 352. The court also noted, "counsel now indicates that Ms. G[.], having been apprised of her statements in the defendant's motion, now 'recants' such statement. This court is concerned with the defendant's propensity to expand this proceeding into areas well beyond the ambit of this trial."

## B. Analysis

To be admissible, evidence of third party culpability "need only be capable of raising a reasonable doubt of defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) It should be treated "like any other evidence: if relevant it is admissible ([Evid. Code, ]§ 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code, ]§ 352)." (*Hall*, *supra*, at p. 834.) However, our high court has counseled, "At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: *there must be direct or circumstantial evidence linking the third person* to the actual perpetration of the crime." (*Hall*, *supra*, at p. 833, italics added; accord, *People v. Hamilton* (2009) 45 Cal.4th 863, 914.) Since third party culpability evidence is treated like other evidence, the trial court has broad discretion, and we review the trial court's decision under an abuse of discretion standard. (*People v. Harris* (2005) 37 Cal.4th 310, 337.)

20

Defendant argues this issue goes beyond state law error, as it was characterized in *People v. Cudjo* (1993) 6 Cal.4th 585, 610-611, and constitutes federal constitutional error by denying him his right to present a defense and have a fair trial and due process. However, the federal Constitution does not afford defendant the right to present evidence that is irrelevant or of only marginal relevance. (*Crane v. Kentucky* (1986) 476 U.S. 683, 689-690 [90 L.Ed.2d 636]; *United States v. Scheffer* (1998) 523 U.S. 303, 308 [140 L.Ed.2d 413] [states have broad latitude under the federal Constitution to establish rules excluding evidence from criminal trials].)

Defendant's offer of proof resembles the offer of proof made in *People v. Edelbacher* (1989) 47 Cal.3d 983. In that case, the defendant's mother testified outside the jury's presence that her daughter had worked with the victim at a fast-food outlet, and that on the morning following the victim's death the daughter told her that the victim had asked the daughter several times if the daughter knew anyone who wanted to buy some marijuana. (*Edelbacher*, *supra*, at p. 1017.) The defendant's mother further testified that an unidentified friend had told her that the victim's mother had been unhappy because the victim had been running around with some Hell's Angel-type people. (*Ibid.*) The defendant's counsel urged the trial court to admit the testimony " 'to show by circumstantial evidence the possible motive of third parties to commit the crime and circumstantial evidence as to possible identity of third parties to commit the crime.' " Defense counsel argued that " 'people who are dealing in narcotics frequently end up injured or shot.' " (*Id.* at pp. 1017-1018.) The trial court sustained the prosecution's objection, and our high court affirmed the trial court's ruling. (*Ibid.*) "Quite apart from the obvious hearsay problems, defendant's proposed evidence did not identify a possible suspect other than defendant or link any third person to the commission of the crime. The evidence did not even establish an actual motive but only a possible or potential motive for [the victim's] murder. As we stated in *Hall*, *supra*, 41 Cal.3d 826, evidence of a third party's motive, without more, is inadmissible. A fortiori, evidence showing only a

21

third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible." (*Id*. at p. 1018.)

Similarly, in *People v. Samaniego* (2009) 172 Cal.App.4th 1148, the court upheld exclusion of evidence that the victim, a drug dealer, got into an argument with, and was threatened with a knife by, a third party on the day the victim was shot and killed. (*Samaniego*, *supra*, at pp. 1172-1173.) The eyewitness to the shooting did not identify the third party as having been present, and another witness -- who knew the third party's voice and who heard the assailants -- could not identify the third party as having been one of the assailants. (*Id*. at p. 1175.) The *Samaniego* court held the trial court properly excluded the evidence because, although the defendant's evidence showed the third party had motive and opportunity, there was no evidence he was involved in any way with the murder. (*Ibid*.)

Here, the defense did not make an offer of proof as to who would testify about the supposed drug transaction at the time of McFadzean's shooting or the supposed third party shooting of McFadzean. The defense merely said that, if defendant testified, he would impeach Griffin should she "deny the allegations of drug trafficking and coercion by Mark McFadzean." But drug trafficking and coercion were collateral matters which the trial court correctly noted would consume time unnecessarily. The coat with drug money was also collateral. Furthermore, the supposed testimony of prison inmate Rosalee Barfield, assuming she did not invoke her Fifth Amendment right against self-incrimination and assuming she testified as defendant hoped, would not speak to the shooting.

Not only did the defense fail to provide direct or circumstantial evidence linking the purported unknown third party drug dealer to the shooting of McFadzean, but the defense theory of this phantom shooter was farfetched and incapable of raising a reasonable doubt. According to this theory, the shooting occurred during a drug transaction unrelated to defendant, a drug transaction to which Griffin brought her

22

teenage daughter. After the shooting, Griffin happened to drive by defendant as she was driving around with the unconscious McFadzean, who had a shattered artery that was gushing blood. Although McFadzean was dying, after a chance encounter with defendant, he developed a plan on the fly to blame defendant for the shooting so defendant would no longer be in Griffin's life and coerced Griffin and her daughter to participate in this conspiracy to frame defendant. All of this occurred between the earlier events of the day where defendant waved a gun and expressed anger about Griffin's relationship with McFadzean and the later discovery by police of defendant's duffel bag containing additional rounds of ammunition in back of the home where defendant lay in wait for Griffin to return home with McFadzean -- a circumstance that was not mentioned in defendant's offer of proof.

Defendant points out that no witness, other than Griffin and McFadzean, testified that defendant shot McFadzean. This is true, but as we have noted, other witnesses did testify that hours before shooting McFadzean, defendant was at Griffin's house, armed with a gun and furious about Griffin's relationship with McFadzean. And defendant's own witness, his niece, placed him outside her residence with Griffin and McFadzean shortly before a police officer saw McFadzean in Griffin's maroon car bleeding from a gunshot wound. The officer testified Griffin waved him down around 1:20 a.m. on March 3, 2008. Defendant's niece testified for the defense that during the "early morning hours" of March 3, 2008, she saw defendant arguing in the street with Griffin near a burgundy car, which she had seen both defendant and Griffin driving in the past. Griffin's teenage daughter was also there. According to the niece, either defendant or Griffin knocked on her door. This is obviously inconsistent with defendant's offer of proof, presented in his attorney's declaration, that defendant refused to get involved when Griffin drove by searching for help for the wounded McFadzean and saw defendant on the street. That the niece denied hearing a gunshot is inconsequential.

23

The proffered evidence simply was not capable of raising a reasonable doubt of defendant's guilt. Further, there was no evidence the unknown third party drug dealer even existed, and if he did, whether he had an opportunity to commit the shooting; nor was there direct or circumstantial evidence linking this unknown person to the shooting.

Even assuming for the sake of argument that the evidence existed and had any relevance, it would clearly require undue consumption of time, and the trial court did not abuse its discretion by its ruling in this regard. Moreover, the evidence depended entirely on multiple hearsay that had been denied by the declarant, Griffin, denials defendant would try to impeach *if* he later decided to testify.

The trial court did not err in excluding evidence, and we therefore need not address defendant's argument about prejudice.

We conclude defendant fails to show grounds for reversal based on exclusion of third party evidence.

### III.  Sanitizing Victims' Prior Convictions

Defendant argues his trial counsel was ineffective in failing to object to the trial court's sanitizing the complaining witnesses' prior convictions for impeachment. We see no grounds for reversal.

The defense moved in limine to impeach Griffin and McFadzean with prior convictions, as follows:  (1) As to Griffin -- 1997, solicitation of lewd act; 2006, federal conviction of conspiracy to provide an inmate with a prohibited object, possession of heroin with intent to distribute, and possession of marijuana with intent to distribute.  (2) As to McFadzean -- 1990, aid/abet unlawful entry; 1992, theft, sexual assault, and fraud; 1993, battery and robbery; 1995, trespass to vehicle and cocaine possession; 1996, sexual assault and possession of stolen car; 1997, possession of stolen car; 1998, possession of stolen car; and 1999, armed robbery and bank robbery.

The trial court also ruled that defendant's prior convictions would be admitted if he testified, but as requested by the defense, the convictions would be sanitized by calling

24

them crimes of moral turpitude.[13]  As for the prosecution witnesses, the prosecution asked that the court sanitize their prior convictions just as it had done for defendant, and the trial court granted that request.  Ultimately, four witnesses -- two prosecution witnesses (Griffin and McFadzean) and two defense witnesses (defendant's niece and brother) -- admitted prior convictions or adjudication involving "moral turpitude."

On appeal, defendant argues ineffective assistance of counsel in his trial counsel's failure to object to sanitizing the prosecution witness convictions.  To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).)  " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) _ U.S. _, _ [178 L.Ed.2d 624, 642 (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284].)

The reason why *Strickland's* bar is high is because " '[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.  [Citation.] . . .  It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'  [Citations.]  The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. [Citation.]" (*Richter, supra*, _ U.S. at pp. _, _ [178 L.Ed.2d at pp. 642-643].)

---

[13] Ultimately, defendant did not testify.

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citation], and we accord great deference to counsel's tactical decisions." (*People v. Frye* (1998) 18 Cal.4th 894, 979 (*Frye*), disapproved on other grounds in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)  "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Defendant argues there can be no plausible rational tactical purpose for defense counsel's failure to object to sanitizing prosecution witnesses' prior convictions. However, defendant's own witnesses had prior records which defense counsel may have preferred not to name, including defendant himself if he chose to testify.  Thus, defendant fails to show deficient performance.

Furthermore, defendant has not shown prejudice.  To establish prejudice, "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, __ U.S. at p. __ [178 L.Ed.2d at p. 642].)  To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient.  (*Strickland*, supra, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694; accord, *Ledesma*, *supra*, 43 Cal.3d at p. 218.)

During deliberations, the jury asked for a definition of moral turpitude.  Without objection, the trial court told the jury "[m]oral turpitude means a readiness to do evil.  It involves conduct that is contrary to justice, honesty, or morality."  The evidence against defendant was compelling.  And since the jury was effectively told that the two witnesses who presented this evidence had been convicted of crimes that showed their readiness to

26

do evil, dishonesty and immorality, it is not reasonably probable defendant would have obtained a better result had the prior convictions not been sanitized as crimes of moral turpitude. Defendant has not overcome *Strickland's* high bar.

Defendant contends that the evidence against him was not strong and repeatedly cites the fact that the jurors made no findings on several firearm use allegations and a great bodily injury allegation as indicating the jury struggled with the case. However, the jury did not indicate it was deadlocked on these allegations and nothing else in the record suggests the jury had difficulty arriving at a decision on these findings. Based on the format of the verdict forms, it may very well be that the failure to return findings on these allegations was the product of a misunderstanding about how to fill out the forms.[14] Indeed, we note that despite the jury not returning firearm use findings on some of the

---

[14] The jury left blank the true/not true lines for the firearm allegations as to count two (kidnapping - Morris), count three (criminal threats - Morris), count six (kidnapping - McFadzean), count eight (criminal threats - McFadzean), and count nine (criminal threats - Griffin) and the great bodily injury allegation on count six (kidnapping - McFadzean). We note that the record does not show that the trial court explained how to fill out the verdict forms, so the jury apparently had to figure that out on its own. On each of the forms where the jury provided no finding, the finding language followed the lesser included offenses, which the jury did not reach because of its guilty verdict on the charged offense. In contrast, on the forms where the allegation finding language followed immediately after the charged offense, the jury checked off the true finding. The one exception is where the jury returned a verdict of guilty on the lesser included offense in count ten. On that form, the jury indicated a true finding as to the firearm use allegation, which immediately followed the lesser included offense.

When the trial court received the executed verdict forms from the jury, it indicated it was checking to make sure the forms were dated and signed. The verdicts were then read by the clerk. Thereafter, without rereading the verdicts and findings, the trial court polled the jury. There is nothing in the record indicating that the trial court noticed there were no findings as to the aforementioned counts. Based on comments made by the court at sentencing, it appears that the failure to make findings on the aforementioned allegations was not discovered until after the trial, when the prosecutor expressed some concern about this circumstance in e-mails exchanged between the court and counsel (which are not part of the record).

27

counts related to Morris and McFadzean, it nevertheless did find true the firearm allegations as to Morris and McFadzean on one count related to those victims.[15] And despite the fact the jury did not make a finding on the great bodily injury allegation on a count related to McFadzean, the jury nevertheless made that finding on another count related to the same episode.[16]

Under the heading complaining about "sanitizing" the prior convictions of prosecution witnesses, defendant attempts to raise a different issue, stating Griffin and McFadzean had more convictions than the jury was told. We need not address points not adequately briefed under a separate heading. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19.)

We conclude defendant fails to show grounds for reversal based on defense counsel's failure to object to sanitization of prior convictions.

### IV. Claims of Prosecutorial Misconduct

Defendant argues the judgment must be reversed to remedy purportedly prejudicial prosecutorial misconduct. We disagree.

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request

---

[15] The jury found the personal use of a firearm allegations true as to count one (assault with a firearm - Morris) and count five (assault with a firearm - McFadzean).

[16] The jury found the great bodily injury allegation true on count five (assault with a firearm - McFadzean).

an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. [Citation.]' [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 359 (*Parson*).)

Moreover, "the prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.) To prevail on a claim of prosecutorial misconduct in argument to the jury, the defendant must show a reasonable likelihood that the jury understood or applied the prosecutor's comments in an improper or erroneous manner. (*Frye*, *supra*, 18 Cal.4th at p. 970.)

### A. Argument Regarding Disbelieving the Prosecution Witnesses

Defendant claims the prosecutor misstated the prosecution's burden of proof and the reasonable doubt standard by improperly arguing that acquittal would require wholesale rejection of the testimony of all of the prosecution witnesses. We disagree.

We first dispose of defendant's claim that the standard of proof beyond a reasonable doubt requires only residual doubt to acquit. For this proposition, defendant cites only federal circuit court of appeals decisions, applying case law holding that jurors should not be instructed that they need to be able to articulate good and sufficient reasons for their doubts about guilt. (*Humphrey v. Cain* (5th Cir. 1997) 120 F.3d 526, 530-531; *Dunn v. Perrin* (1st Cir. 1978) 570 F.2d 21, 23-24.) Defendant also cites a subsequent opinion in *Humphrey v. Cain* (5th Cir. 1998) 138 F.3d 552, which merely confirmed the appellate court's earlier opinion while resolving conflicting panel decisions as to whether the stated rule was available to a habeas corpus petitioner whose conviction was final when the rule was announced. The *Dunn* court said nothing about "residual doubt," and the first *Humphrey* case merely commented without explanation, "Insisting that a juror be able to articulate *a* reason is a troublesome step upon residual doubt." (*Humphrey*, *supra*, 120 F.3d at p. 531.)

29

The term "residual doubt" is generally used in the inapposite context of the penalty phase of a death penalty case, which allows jurors to consider residual doubt about guilt when deciding whether to impose the death penalty, though the defendant is not entitled to a jury instruction on residual doubt.  (*Oregon v. Guzek* (2006) 546 U.S. 517, 525-526 [163 L.Ed.2d 1112]; *Franklin v. Lynaugh* (1988) 487 U.S. 164 [101 L.Ed.2d 155] [plurality doubted whether Eighth Amendment gave defendant a right to instruction that jury could consider residual doubts about guilt as mitigating circumstances in penalty phase; even if defendant had some right to seek jury consideration of residual doubt about guilt in penalty phase, rejection of instruction did not impair his right to argue the matter to the jury]; *People v. Linton* (2013) 56 Cal.4th 1146, 1198; *People v. Huggins* (2006) 38 Cal.4th 175, 251.)

This is not a death penalty case, and we accordingly disregard defendant's point about residual doubt.  Additionally, as will appear, the prosecutor did not improperly argue to the jurors that they must be able to articulate a good and sufficient reason for having reasonable doubt.

The prosecutor argued:

"So what is this case about?  It's about every witness who testified.  In order to find this defendant not guilty, you have to say that Mikio Morris is a liar.  You have to say, I don't believe anything that Mikio said.  He completely lied about this defendant putting a gun to my head.

"In order to find this defendant not guilty, you have to say, Vivian Richardson, who is a business owner, she lied.  This woman that's known him since he was eight years old, she lied.  She lied to the officer that day.  You saw her talking to Officer Hall on the videotape that night.  You can look at the videotape.  Vivian is here.  She lied to him.  She came in here and lied, I mean, because she could have said, I was afraid of [defendant], right?  He could be charged with criminal threats, but she was honest.

30

She took her oath seriously. She said he did threaten me, but I wasn't afraid. You have to say she's a liar. I don't believe her.

"Dominique Griffin, the mother of her [*sic*] child, she lied. In order to find him not guilty, you have to say, she's a liar. Now, you saw Dominique cry. That's the reason we have jury trials because you get to see these people. She cried on the stand. And when I asked her, I said, 'Dominique, do you still love [defendant]?'

"What did she tell you? She said, 'I love him. He's the father of my child. I'm just disappointed that he did what he did.' You got to say she lied. Dominique is a liar, I don't believe anything that she says.

"Mark McFadzean, the person that got shot. He's a liar, too. And -- and I don't know if you noticed it, ladies and gentlemen, but Mark wanted to tell his story. I mean, every time he was asked, he wanted to move, he had his arm like this, he was doing like this, he -- he clearly remembers what happened to him.

"And he was trying every way he could to explain it to you. You would have to say he's a liar. Mark made that all up. He lied. That's what you have to say to find this defendant not guilty.

"Officer Hall, the officer that you see on the videotape. The officer that was trying to save Mark McFadzean's life, he lied. When he said that Dominique and [D.W.] were freaked out, that they were crying, that they were upset immediately after Mark got shot, you have to say Officer Hall's lying, he doesn't know what he's talking about.

"You have to say Officer McGovern, one of the officers with this duffel bag [containing defendant's parole card], who get back there [in Griffin's yard] and said, this bag was dry, but there's morning dew. That officer lied. You can't believe Officer McGovern.

"Officer Kinion, the one who said, 'Hey, when I opened this bag, the first thing I saw is this parole card.' Officer Kinion is a liar. He doesn't -- I don't believe him. That's what you have to do to find the defendant not guilty.

31

"Detective Heinlein, you have to say the detective that got on the case, who was trying to find this defendant who said, 'I wasn't by all of his houses [*sic*], all these houses looking for him, that Dominique was helping me out with the investigation, that her family was trying to find this man.' Detective Heinlein, he's a liar. I don't believe that.

"[McFadzean's] doctors . . . , you have to say all those doctors, they lie.

"No. Mark looks okay. He looks like he walks fine to me. So I find him not guilty. That's what you have to say, ladies and gentlemen.

"[A.B.], the defense witness that turned into the star prosecution witness. You got to say she's a liar, too. Even though I heard her on tape telling the detective it was four people there, Dominique was holding [defendant's] hand I wonder what was in it, and I was so traumatized that I ran barefoot to my cousin's house to see what was going on. [A.B.], she's a liar. I don't believe her either.

"All these people, ladies and gentlemen, you have to say I don't believe all of these people to find [defendant] not guilty."

Defendant did not object in the trial court to these comments. Thus, he forfeited his current claim of prosecutorial misconduct. (*Parson*, *supra*, 44 Cal.4th at p. 359.)

Moreover, we are confident the jury would understand the prosecutor's remarks, not as reducing the burden of proof, but as legitimate comment on the prosecutor's perception of the strength of the prosecution's case. (*Frye*, *supra*, 18 Cal.4th at p. 972 [prosecutor's comment that prosecution witness was telling the truth was not improper vouching but simply a call to reflect on all the evidence presented at trial].)

**B. Argument Regarding D.W. not Testifying**

Defendant argues the prosecutor committed prejudicial misconduct by telling the jurors D.W. was too traumatized to testify and by telling the jurors what D.W.'s testimony would have been had she testified. We disagree.

Defense counsel in closing argument to the jury noted that percipient witness D.W. did not testify. Defense counsel suggested that her absence was akin to a

prosecution of Lee Harvey Oswald for the killing of John F. Kennedy, where the prosecution relied solely on the testimony of "mobster Jack Ruby [who killed Oswald]" and not "people who weren't in the mob. They didn't call the people who didn't have a horse in the race. You might be dissatisfied."

In rebuttal, the prosecutor said:

"[D.W.], the defense says, Well, where is [D.W.]? That means -- well, I guess we must find him not guilty because we didn't hear from [D.W.]. So I guess they have something to hide. Let's speculate as to why she wasn't here. We already know. All their interviews were recorded. *If* [*D.W.*] *said something drastically different from everyone else*, *you don't think* [*defense counsel*] *would have called her?* I mean, this girl was 15 years old.

"Look at that tape. See how she acted. Did she need to be traumatized again? Does she have to relive this again? Dominique made it clear. She said [D.W.] does not even want to talk about this. [D.W.] doesn't want to think about it. But I guess according to [defense counsel], she needed to be traumatized again in order for you to find [defendant] guilty.

"I mean, we all know in sex assault cases and that's not this, it happens that witnesses don't want to testify for all kind of reasons. We all know that. It doesn't mean that they're lying. Just do we have to keep traumatizing people, a 15-year-old girl. [¶] . . . [¶]

"I mean, is that necessary, ladies and gentlemen? Is that what you need? Is the videotape enough? You clearly see that she's there. You clearly see her crying and upset. What else do you need?" (Italics added.)

Again, defendant forfeited his claim by failing to object to these comments in the trial court. (*Parson*, *supra*, 44 Cal.4th at p. 359.)

Moreover, the prosecutor's comments were proper rebuttal to defense counsel's comment on D.W.'s absence as a witness. (*People v. Daya* (1994) 29 Cal.App.4th 697,

33

715 [prosecutor may be justified in making comments in rebuttal, perhaps otherwise improper, which respond to defense counsel's arguments and are based on the record].) Here, the prosecutor's remarks were based on the record because the jury had the opportunity to see D.W.'s state of emotional upset in the police video of the patrol officer helping McFadzean.

Defendant contends that the prosecutor told the jury D.W.'s testimony would have corroborated Griffin, but does not cite a specific comment made by the prosecutor in support of this contention. It appears defendant is asserting the prosecutor suggested D.W.'s testimony would have been consistent with Griffin's when he told the jury, "*If* [*D.W.*] *said something drastically different from everyone else, you don't think* [*defense counsel*] *would have called her?*" (Italics added.) We view this argument differently. It is well settled that a prosecutor can comment on a defendant's failure to call logical witnesses. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1333; *People v. Cornwell* (2005) 37 Cal.4th 50, 90, disapproved on other grounds in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) That is what happened here. In response to the defense argument about the prosecution not calling D.W., the prosecutor merely commented on defendant's failure to call her as well.

### C.  Comments Regarding Defendant not Going to the Police

Defendant complains the prosecutor in rebuttal argument commented on defendant's exercise of his right not to discuss the case with the police after suspicion focused on him.

The prosecutor said: "And if you believe the defense that there was some mystery man that did this, that it wasn't [defendant], well, we all know from Dominique, this was on the news.

"And she said [defendant] called her about the fact when he saw himself on the news. If it wasn't him and he sees that he's accused of all these crimes, why didn't he say, Hey, I'm gonna go to the police office and see what's going on with this?

34

Why didn't he say, Hey, officer, I saw myself on the news, I wasn't there, I was -- I was here. I got -- I got all these alibi witnesses. Why didn't he do that since it wasn't him?

"Because a guilty person would run away. A guilty person would go to Las Vegas and hide out. A guilty person, when they're stopped for a traffic ticket, instead of giving their name would give their brother's name, somebody would know that they did something wrong.

"So it is clear from the evidence that we got the right person. That there is no question that we have the right person."

Again, defendant forfeited any claim related to this argument by failing to object to it in the trial court. (*Parson*, *supra*, 44 Cal.4th at p. 359.)

Moreover, defendant's argument that the prosecutor's remarks were an improper comment on defendant's exercise of his constitutional right to silence lacks merit.

Although the obvious constitutional right at issue is the Fifth Amendment right to remain silent, defendant frames this contention as a due process violation of a "constitutional right not to discuss his alibi with the prosecutor or the police." He cites inapposite cases applying the principle that comment about *postarrest* silence and impeachment of a defendant's testimony with *postarrest* silence violates due process. (E.g., *People v. Lindsey* (1988) 205 Cal.App.3d 112, 116-117 (*Lindsey*) [prosecutor's closing argument comment on defense counsel's failure to advise law enforcement before trial about defendant's alibi amounted to a comment on defendant's right to remain silent and violated due process]; *People v. Galloway* (1979) 100 Cal.App.3d 551, 556-559 (*Galloway*) [prosecutor's cross-examination of the defendant and comment during closing argument about the defendant's postarrest failure to inform law enforcement about his alibi violated due process].)

Here, however, the prosecutor instead commented on defendant's failure to come forward *prearrest*, when he apparently saw on the news that his girlfriend was accusing him of kidnapping their daughter. This does not implicate due process, i.e., the

35

fundamental fairness that precludes prosecutors from using against a defendant an invocation of the right to remain silent or a defendant's choice to remain silent postarrest discussed in *Lindsey* and *Galloway*. (See *Doyle v. Ohio* (1976) 426 U.S. 610, 617-619 [49 L.Ed.2d 91].)

It has long been the rule that closing argument comment on a defendant's testimony and prearrest silence violates neither the Fifth Amendment nor the due process clause of the Fourteenth Amendment. (*Jenkins v. Anderson* (1980) 447 U.S. 231, 238-239 [65 L.Ed.2d 86] [prosecutor's cross-examination of the defendant and closing argument comments regarding the defendant's failure to claim self-defense in the two weeks after the stabbing before he turned himself in did not violate defendant's right against self-incrimination or due process rights].) And in California it was long ago stated, "[p]rearrest silence may be commented upon unless the court finds the silence was an invocation of Fifth Amendment rights." (*People v. Free* (1982) 131 Cal.App.3d 155, 165; see *id.* at p. 164 [distinguishing *Galloway* as involving postarrest silence].)

Recently, the United States Supreme Court discussed the right against self-incrimination in the context of a prearrest, noncustodial police interview. In *Salinas v. Texas* (2013) __ U.S. __ [186 L.Ed.2d 376], during a noncustodial, non*Mirandized* interview by police, the defendant did not answer when asked whether a ballistics test would show that shell casings found at the scene would match his shotgun. Instead, he looked down at the floor, shuffled his feet, bit his bottom lip, clenched his hands in his lap and began to tighten up. After a period of silence, the investigators asked other questions, which defendant answered. (*Salinas*, *supra*, __ U.S. at p. __ [186 L.Ed.2d at p. 383].) The defendant did not testify at trial. (*Ibid*.) Over defense objection, the prosecutors, as part of their case-in-chief, used the defendant's reaction to the police questioning as evidence of the defendant's guilt. (*Ibid*.) The high court held that the defendant's right against self-incrimination was not violated by admitting evidence of his silence after the shell casing question. (*Salinas*, *supra*, __ U.S. at p. __ [186 L.Ed.2d at

36

p. 385].)  "[A] defendant normally does not invoke the privilege by remaining silent."

(*Ibid.*)  The court held that because the defendant did not say he was refusing to answer

on Fifth Amendment grounds, the prosecution's use of his noncustodial silence did not

violate the Fifth Amendment.  Further, the court declined to craft an exception to the

" 'general rule' " that the privilege against self-incrimination must be invoked in order to

benefit from it (*ibid.*), rejecting the notion that the invocation requirement should not

apply where a witness is silent in the face of official suspicions (*Salinas*, *supra*, _ U.S. at

p. _ [186 L.Ed.2d at p. 386]).  Such a rule "would do little to protect those genuinely

relying on the Fifth Amendment privilege while placing a needless new burden on

society's interest in the admission of evidence that is probative of a criminal defendant's

guilt."[17]  (*Ibid.*)

Here, defendant never invoked his right to remain silent.  As the prosecutor

pointed out, he fled and used a false name when he was caught, conduct from which

consciousness of guilt could be inferred.  (*People v. Mendoza* (2000) 24 Cal.4th 130, 180

[flight]; *People v. Showers* (1968) 68 Cal.2d 639, 643 [false statements].)  Under the

circumstances, we have no trouble concluding defendant's prearrest silence was not an

invocation of his right to remain silent and the prosecutor's comment on it violated

neither defendant's self-incrimination right nor his due process rights.

### D.  Argument Regarding Santa Claus

Defendant complains the prosecutor in rebuttal argument said to the jury, "And

if you believe that [defendant] is not guilty, then you must still believe in Santa Claus.

---

[17] *Salinas* was a plurality opinion by three justices.  Two additional justices concurred in
the result but expressed the view that the defendant's claim would fail even if he had
invoked the privilege, because the Fifth Amendment does not apply to precustodial
silence.  (*Salinas*, *supra*, _ U.S. at p. _ [186 L.Ed.2d at p. 389 (Thomas & Scalia, JJ.,
conc. in jdmt.)  The other four justices dissented.  (*Salinas*, *supra*, _ U.S. at pp. _-
[186 L.Ed.2d at pp. 390-397.]

You must not be using your common sense." Defendant claims the comment improperly raised the bar for acquittal from a reasonable doubt to extreme doubt and improperly shifted the burden of proof.

Defendant forfeited the point by failing to object in the trial court and, in any event, defendant's argument is clearly meritless, because the prosecutor's comment merely suggested gullibility as the only means to disregard the overwhelming evidence. The argument in no way minimized the burden of proof.

### E. Comment Regarding Defense Counsel

Defendant argues the prosecutor in rebuttal argument accused defense counsel of trying to mislead the jurors, as follows:

"Another thing [defense counsel] said was, [w]ell, since this is a circumstantial evidence case, there's two ways you can think about it. And then, if you think . . . there's some evidence that he's innocent, then you must find him innocent.

"But . . . this is a direct evidence case. This is not a circumstantial evidence case. . . . [¶] . . . [¶]

"This is direct evidence. You have witnesses that said, No, I saw [defendant] shoot the gun. I saw [defendant] make the threats. I saw [defendant] with my own eyes do all these crimes. There's no circumstantial evidence in this case, ladies and gentlemen. So you're not doing this [']either or['] that [defense counsel] was talking [*sic*]. He's trying to fool you. He's trying to pull the wool over your eyes.

"[Defense counsel]: I'm going to object.

"THE COURT: Overruled."

The trial court properly overruled the objection. A prosecutor commits misconduct if he or she attacks the integrity of defense counsel or casts aspersions on defense counsel. (*People v. Hill* (1998) 17 Cal.4th 800, 832.) However, a prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics. (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) "An argument which does no more than point out

38

that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47.)

We conclude defendant fails to show grounds for reversal based on prosecutorial misconduct.

### V. Firearm Enhancement Sentence on Count Five

Defendant contends the trial court improperly added to count five, assault with a firearm, an unauthorized sentence of 25 years to life for personally discharging a firearm causing great bodily injury under former section 12022.53, subdivision (d).[18] Defendant argues former section 12022.53 by its own terms does not apply to assault with a firearm, was not pleaded, and was not found true. The People concede the point. However, we believe the People concede too much. Although the trial court erred in citing former section 12022.53 at the sentencing hearing and sentencing defendant consistent with the punishment for that enhancement, the abstract of judgment correctly shows for count five an enhancement under section 12022.5, subdivision (a).[19] Moreover, the trial court

---

[18] At the time of defendant's offenses, section 12022.53, subdivision (d), provided, "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a) [murder, mayhem, etc., but not assault with a firearm], Section 246 [discharge of firearm at occupied building or vehicle], or subdivision (c) or (d) of Section 12034 [discharge of firearm from vehicle], personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

[19] At the time of defendant's offenses, section 12022.5 provided in part, "(a) Except as provided in subdivision (b) [use of assault weapon or machine gun], any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense. [¶] . . . [¶] (d) Notwithstanding the limitation in subdivision (a) relating to being an element of the

39

should also have imposed a consecutive three-year enhancement under former section 12022.7,[20] subdivision (a), for personal infliction of great bodily injury, as charged and as found true by the jury.

An unauthorized sentence may be corrected on appeal despite the defendant's failure to object in the trial court. (*In re Renfrow* (2008) 164 Cal.App.4th 1251.) The reviewing court may correct an unauthorized sentence even on a point not raised by the parties (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6) and even if the corrected sentence is more severe for the defendant than the original sentence (*People v. Serrato* (1973) 9 Cal.3d 753, 763-765, disapproved on other grounds in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1).

In the third amended information, count five alleged section 12022.5, subdivision (a), personal use of a firearm, and section 12022.7, personal infliction of great bodily injury. The jury was properly instructed on both allegations, and found both true.[21] Separate enhancements based on sections 12022.5 and 12022.7 are permissible where, as here, a defendant commits assault with a firearm, personally uses the firearm,

---

offense, the additional term provided by this section shall be imposed for any violation of Section 245 if a firearm is used . . . ."

[20] Section 12022.7 states in part, "(a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years. . . . [¶] (g) This section . . . shall not apply if infliction of great bodily injury is an element of the offense."

[21] Section 12022.53 *was* pleaded as to count six (kidnapping), as was a great bodily injury allegation under section 12022.7. (However, the jury did not fill out that part of the verdict form, which appeared on a separate page following a page which ended with lesser included offenses of attempted kidnapping and false imprisonment, which the jury did not need to fill out after finding defendant guilty of kidnapping. The trial court apparently overlooked the jury's oversight. Since there was no finding on the section 12022.53 allegation for count six, the trial court properly did not impose a section 12022.53 or 12022.7 enhancement for count six.

and personally inflicts great bodily injury. (*People v. Ahmed* (2011) 53 Cal.4th 156, 159-160.)

The reporter's transcript shows the trial court cited section 12022.53 at the sentencing hearing, as follows:

"Turning . . . to Count Five, a violation of Penal Code section 245(a)(2), assault with a firearm, and the allegations that the defendant has suffered two prior 'strike' convictions having been found true by the court, as well as the allegation that the defendant having personally used a firearm pursuant to Penal Code section 12022.5 and discharged a firearm causing great bodily injury pursuant to Penal Code section 12022.53(d), having been found true by jury as charged in Count Five . . . , the defendant is sentenced to the state prison of the State of California for the term of 50 [years] to life, comprised as follows:

"Twenty-five to life for the violation of Penal Code section 245(a)(2) by a person having found to be a person who has suffered two prior 'strike' convictions and 25 to life for the Penal Code section 12022.53(d) enhancement, imposed consecutively.

"The court selects and imposes the upper-term sentence of ten years with respect to Penal Code section 12022.5(a) enhancement violation; however, this ten-year enhancement is stayed pursuant to Penal Code section 654 as articulated by People versus Sinclair, (2008) 166 Cal.App.4th 848.[22] Consecutive sentencing is selected as to this count because it involved separate acts and a separate victim."

The abstract of judgment does not cite section 12022.53 and does not show the stay referenced by the court but instead states the following enhancements:

---

**22** *People v. Sinclair* (2008) 166 Cal.App.4th 848, said that when a section 12022.53 enhancement must be imposed, the trial court is obliged to impose and stay an additional enhancement under section 12022.5. (*Sinclair*, *supra*, at p. 854, citing *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1127-1130.)

Count one (assault with firearm on Mikio Morris), section 12022.5, subdivision (d), 10 years;

Count five (assault with firearm on Mark McFadzean), section 12022.5, subdivision (a), 16 months; and

Count ten (attempted criminal threats against D.W.), section 12022.5, subdivision (a), 16 months.

Generally, in criminal cases the oral pronouncement of judgment controls over the written judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) Here, the trial court erred in sentencing defendant pursuant to section 12022.53 for count five assault with a firearm, because that statute does not apply to assault with a firearm, was not pleaded in count five, and was not found true.

The abstract reflects a consecutive 16-month sentence on the section 12022.5, subdivision (a)(1) enhancement for count five. However, the court actually orally pronounced a sentence of 10 years and stayed imposition of that sentence pursuant to section 654. Because the sentence on the section 12022.53 enhancement was unauthorized, we order that the stay be lifted and the 10-year sentence on the section 12022.5(a) enhancement be executed. We also direct that the abstract be corrected accordingly.

Additionally, the failure to sentence defendant on the section 12022.7 great bodily injury allegation must be addressed. We remand with directions to impose a sentence for the section 12022.7 enhancement on count five, as charged and found true.

Also, we note that the abstract states section 12022.5(d) for the firearm enhancement on count one. Consistent with the information, the verdict form indicates a true finding on a firearm enhancement pursuant to section 12022.5(a)(1). And as we have noted, there was no subdivision (a)(1) of section 12022.5 at the time of these

42

offenses. (See fn. 3, *ante*.) We direct that the abstract be corrected to reflect section 12022.5(a) as to counts one, four and ten.[23]

## VI. Section 654 Error

Defendant contends the trial court improperly ordered sentences on three of the criminal threats counts stayed under section 654[24] to run concurrently and consecutively. The People concede the point. We agree that there was section 654 error.

## A. Background

On count three, criminal threats against Morris, the trial court imposed a term of 25 years to life and stayed execution of the sentence pursuant to section 654. The court then stated, "As to Counts One through Three, inclusive [assault with firearm on Morris, kidnapping Morris, and criminal threats against Morris], *the court imposes concurrent sentencing among these counts* inasmuch as the acts underlying the conduct herein were committed on the same occasion, involved the same victim, and occurred at the same place as part of a single course of conduct. . . ." (Italics added.)

The court sentenced defendant to 25 years to life on count six, the kidnapping of Mark McFadzean. As to count eight, criminal threats against Mark McFadzean with personal use of a firearm, the court sentenced defendant to 25 years to life, stayed pursuant to section 654. The court then said, "Because these events involved a similar set of operative facts, the sentences for *Counts Six and Eight shall run concurrent to one another*; however, because the facts underlying the events involved in Counts Six and Eight are distinct from those involved in Count Five [assault with a firearm on

---

[23] See footnote 3, *ante*.

[24] Section 654 provides in part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

43

McFadzean] with respect to location and conduct, *the court runs these sentences consecutive to the sentences imposed for Counts One through Four* [offenses against Morris and Richardson], *and Count Five . . . .*" (Italics added.)

As to counts seven and nine, kidnapping of Griffin and criminal threats against Griffin, the court sentenced defendant to 25 years to life for the kidnapping. For the criminal threats, the court sentenced defendant to 25 years to life, stayed under section 654. The court then said, "Because these events relating to Miss Griffin involved a similar set of operative facts, the sentences for Counts Seven and Nine shall run concurrent to one another; however, because the facts underlying the events involved in Counts Seven and Nine are distinct from those involved in the foregoing, including a different victim and efforts to dissuade the defendant from his actions, the court accordingly runs Counts Seven *and Nine's sentences consecutive* to the sentences imposed for Counts One through Four, and Counts Five, Six and Eight . . . ." (Italics added.)

Thus, the court stayed the sentences on the criminal threats convictions, impliedly finding that the threats were a means of accomplishing the kidnappings and the defendant did not have a separate criminal intent or objective when he made the threats. However, as we read the court's sentencing, the court then imposed the stayed sentence on the criminal threats against Morris to run concurrent with the term imposed for assault with a firearm and kidnapping on Morris. The court imposed the stayed sentence on the criminal threats against McFadzean to run concurrent to the kidnapping of McFadzean but consecutive to unstayed counts. And the court imposed the stayed sentence for the criminal threats against Griffin to run concurrent with the kidnapping of Griffin, but consecutive to unstayed counts.

**B.  Analysis**

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the

44

actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. California* (1960) 55 Cal.2d 11, 19, italics added, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 334.) "If, on the other hand, [a] defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " [Citation.] (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

When section 654 applies, the sentence for the conviction must be imposed and stayed, not ordered to run concurrently or consecutively. (*People v. Deloza* (1998) 18 Cal.4th 585, 594 [section 654 does not allow *any* multiple punishment, whether concurrent or consecutive].)

It is clear that section 654 applies to three strikes sentencing where the three strikes law does not mandate consecutive sentencing. (*People v. Danowski* (1999) 74 Cal.App.4th 815, 824; See also *People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164 (*Cantrell*) [doubled one-strike sentence cannot be both consecutive and stayed because the two are mutually exclusive].) It is less clear whether sections 667, subdivision (c)(6)/(7) and 1170.12, subdivision (a)(6)/(7)[25] of the three strikes law

---

[25] At the time of defendant's sentencing in 2010, former section 1170.12, subdivision (a)(6) and (a)(7) provided in relevant part: "(a) Notwithstanding any other provision of law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more prior felony convictions, as defined in subdivision (b), the court shall adhere to each of the following: [¶] . . . [¶] (6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to this section. [¶] (7) If there is a current conviction for more than one serious or violent felony as described in paragraph (6) of this subdivision, the court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively

require mandatory consecutive sentences for multiple offenses "not committed on the same occasion, and not arising from the same set of operative facts," notwithstanding section 654. (*Danowski*, *supra*, 74 Cal.App.4th at p. 823 [suggesting in dicta that the three strikes law provisions mandating consecutive sentences for multiple offenses not committed on the same occasion, and not arising from the same set of operative facts may be an exception to the section 654 prohibition against multiple punishment].) We need not address this latter point, because the People do not assert that any of the multiple threats made at Griffin's house, at the scene of the shooting, or en route between those locations were made on different occasions or arose out of a different set of operative facts within the meaning of the strike provisions.

We conclude that it was error to order the stayed sentences on the criminal threats convictions to run consecutively or concurrently. A stayed sentence may be executed if there is a reversal of the unstayed count. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468-1469; *Cantrell*, *supra*, 175 Cal.App.4th at p. 1164 [imposition of consecutive and stayed sentence would be meaningless because the stayed sentence would only operate if the principle count were eliminated].) But short of a reversal, there can be no punishment for a sentence stayed pursuant to section 654.

We order that the concurrent and consecutive sentences imposed on the criminal threats counts be vacated. Upon remand, the trial court shall impose the mandatory sentence of 25 years to life on the criminal threats counts and simply stay the sentences on each count pursuant to section 654 without running them either concurrently or consecutively.

---

sentenced in the manner prescribed by law." (Prop. 184, as approved by voters, Gen. Elec. (Nov. 8, 1994).)

The relevant portions of the legislative version of the three strikes law (§ 667, subds. (b)-(i)) were virtually identical. (Stats. 1994, ch. 12, § 1.)

46

## VII. Reimbursement Of Attorney Fees

Defendant argues the trial court erred under section 987.8[26] by ordering, "The defendant shall reimburse the county for services of counsel." The People appropriately concede the error, because the trial court erred. We vacate the order. Defendant shall not be required to pay his attorney the fee.

A challenge to a section 987.8 fee is not forfeited by the defendant's failure to object in the trial court. (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1215.)

Defendant notes, and the People agree, that the record does not reflect that defendant was provided notice he may be required to pay the cost of counsel. Such notice is required by section 987.8, subdivision (f), fn. 26, *ante*.) Nor was a hearing held to determine ability to pay, as required by section 987.8. Indeed, there was not even a determination as to how much defendant had to pay.

"[T]here is a presumption under [section 987.8] that a defendant sentenced to prison does not have the ability to reimburse defense costs. Subdivision (g)(2)(B) of section 987.8 provides in pertinent part: 'Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably

---

[26] Section 987.8 provides in pertinent part: "(b) In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court . . . , the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. . . . [¶] . . . [¶] (f) Prior to the furnishing of counsel or legal assistance by the court, the court shall give notice to the defendant that the court may, after a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost of counsel. The court shall also give notice that, if the court determines that the defendant has the present ability, the court shall order him or her to pay all or a part of the cost. The notice shall inform the defendant that the order shall have the same force and effect as a judgment in a civil action and shall be subject to enforcement against the property of the defendant in the same manner as any other money judgment."

discernible future financial ability to reimburse the costs of his or her defense."
(*People v. Flores* (2003) 30 Cal.4th 1059, 1067.)

Here, defendant was sentenced to prison, and nothing in the record shows unusual circumstances warranting an order for him to pay for costs of counsel.

We strike the order to reimburse counsel costs.

## VIII.  Government Code Section 70373 Assessment

Defendant argues the trial court erred in applying the Government Code section 70373[27] court facilities assessment, because defendant's offenses predated the enactment of the statute.  Defendant acknowledges that we rejected an identical argument in *People v. Fleury* (2010) 182 Cal.App.4th 1486, 1489-1495, and he says he raises the issue to preserve it.

We reject defendant's claim.  The assessment stands.

## DISPOSITION

The case is remanded to the trial court for resentencing.  The sentence on the section 12022.53, subdivision (d) enhancement in count five is vacated.  The stay imposed on the sentence for the section 12022.5, subdivision (a) enhancement on count five is lifted and the 10-year sentence shall be executed.  The trial court is directed to order execution of that sentence.

---

[27] Government Code section 70373 states in part:  "(a)(1) To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense, including a traffic offense, except [specified] parking offenses . . . .  The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony and in the amount of thirty-five dollars ($35) for each infraction. [¶] . . . [¶]  (d) [T]he assessments collected pursuant to subdivision (a) shall all be deposited in a special account in the county treasury and transmitted therefrom monthly to the Controller for deposit in the Immediate and Critical Needs Account of the State Court Facilities Construction Fund, established in Section 70371.5. . . ."

The trial court is further directed to impose a sentence for the section 12022.7 enhancement on count five.

The concurrent and consecutive sentences on the criminal threats counts are vacated. The court shall impose the mandatory sentence of 25 years to life on each of those counts and order those sentences stayed pursuant to section 654.

The order to pay for the services of counsel is vacated. Defendant shall not be required to pay attorney fees.

The court is directed to correct its minute order and abstract for each of the section 12022.5, subdivision (a) enhancements by deleting reference to subdivision (a)(1) and substituting subdivision (a).

The court is further directed to ensure that its minute order reflecting defendant's sentencing shows the changes we have ordered. The court shall correct and modify the abstract consistent with this disposition order and forward a certified copy of the corrected and modified abstract of judgment to the Department of Corrections and Rehabilitation.

The judgment is otherwise affirmed.


                                            MURRAY      , J.


We concur:


       NICHOLSON     , Acting P. J.


         BUTZ         , J.